In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-1983

ALICIA M. PAGE,

*Plaintiff-Appellant,*

*v.*

ALLIANT CREDIT UNION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19-cv-05965 — **Sharon Johnson Coleman**, *Judge.*

ARGUED SEPTEMBER 14, 2022 — DECIDED OCTOBER 25, 2022

Before EASTERBROOK, ROVNER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Alicia Page sued Alliant Credit Union on behalf of herself and other similarly situated customers, alleging that Alliant charged fees in violation of its contract. The district court dismissed Page's claim because, on its reading of the contact, Alliant's fee practices did not breach the contract. Although our reasoning differs slightly from the district court's, we reach the same conclusion and affirm.

## I. Background

Alliant Credit Union is a credit union organized under Illinois law that does business exclusively over the internet. Alliant serves a nationwide customer base that included, during the relevant period, Alicia Page, a citizen of New Jersey. Like many banks and credit unions, Alliant charges a nonsufficient fund ("NSF") fee when it rejects an attempted debit because an account lacks sufficient funds to cover the transaction.[1] This appeal concerns the methods that Alliant can use, pursuant to its contact, to determine whether to assess an NSF fee and how many NSF fees Alliant may charge based on a single transaction by a customer. Page argues that the contract requires Alliant to assess fees using the "ledger-balance method," while Alliant contends that the contract permits it to use the "available-balance method."[2]

### A. The Ledger Balance and Available Balance

There are two basic ways to calculate an account balance for purposes of determining whether it has sufficient funds. The ledger-balance method calculates the balance based on posted debits and deposits. The ledger balance does not

---

[1] An NSF fee differs from an overdraft fee, which is charged when a financial institution allows a transaction that results in a negative balance.

[2] Page asserts that there are two methods of calculating the available balance, the "collected available balance" and the "artificial available balance," which take into account different types of unsettled transactions. But regardless of how Alliant calculates the available balance, if the Agreement promises to use the ledger-balance method, then Page's claim survives dismissal, while if the contract allows Alliant to use the available-balance method, then her claim fails. For ease of reference, we refer simply to the available-balance method.

incorporate transactions until they are settled. The available-balance method, by contrast, calculates a customer's balance by considering holds on deposits and transactions that have been authorized but not yet settled.

To illustrate the difference, suppose an Alliant customer with $500 in his checking account goes to the mall. He pays a merchant $300 using his debit card. Alliant authorizes the payment, but the transaction is not immediately posted. The customer then uses his debit card to pay a second merchant another $300. Under the ledger-balance method, he would have sufficient funds for the second transaction because the first has not yet posted. But under the available-balance method, the $300 authorization would leave an available balance of $200—insufficient funds for the second transaction.

### B. Page's Contract with Alliant

Page believes that her contract with Alliant requires the credit union to use the ledger-balance method when assessing NSF fees and permits only one NSF fee per transaction. She alleges that on January 4, 2017, Alliant charged her a $25 NSF fee when she attempted to pay a $6,000 bill even though her account's ledger balance was $6,670.94. On January 12, 2017, Page alleges that Alliant charged multiple NSF fees "for the same item." Alliant breached its contract, Page argues, when it charged her these fees.

The parties agree that the November 2013 Account Agreement (the "Agreement") applies. It provides, in relevant part:

**7. TRANSACTION LIMITATIONS.**

a. <u>Withdrawal Restrictions</u>. We permit withdrawals only if your account has *sufficient available funds* to cover the full amount of the withdrawal or you have

an established overdraft protection plan. *Checks or other transfer or payment orders which are drawn against insufficient funds may be subject to a service charge as set forth in the Fee Schedule.* If there are sufficient funds to cover some, but not all, of your withdrawal, we may allow those withdrawals for which there are sufficient funds in any order at our discretion. …

**8. OVERDRAFTS.**

a. <u>Overdraft Liability</u>. If on any day, the funds in your savings account are not sufficient to cover checks, fees or other items posted to your account, those amounts will be handled in accordance with our overdraft procedures or by one of the overdraft protection plans outlined below. Alliant's determination of an insufficient account balance may be made at any time between presentation and our midnight deadline with only one review of the account required. We do not have to notify you if your account does not have funds to cover checks, ACH debits, debit card transactions, fees or other posted items. Whether the *item* is paid or returned, *your account may be subject to a charge* as set forth in the Fee Schedule. …

b. <u>Overdraft Protection Plan</u>. If you have applied for and we have approved the Overdraft Protection plan for your account, we will honor checks, ACH debits, and Point-of-Sale (POS) and signature-based debit card transactions drawn on insufficient funds by transferring funds from another account under this Agreement or a loan account, as you have directed, or as required under Alliant's Overdraft Protection policy subject to the Overdraft Transfer Fee as set forth in the

Fee Schedule or per the terms of your applicable loan account. … If the amount of the *item* presented for payment exceeds the total of all available overdraft sources, the item will be returned as non-sufficient funds (NSF) and *you will be charged applicable fees*. This Agreement governs all overdraft transfers, except those governed by agreements for loan accounts.

(emphasis added). The Fee Schedule provides for a $25 "Non-sufficient Fund Item (*each*)." The Governing Law provision states: "This Agreement is governed by Alliant's bylaws, federal laws and regulations, the laws, including applicable principles of contract law and regulations in the State of Illinois, and local clearinghouse rules, as amended from time to time."

**C. Procedural History**

Page filed this putative class action in federal district court on behalf of herself and similarly situated Alliant customers she alleges were improperly charged NSF fees. Page asserted a federal claim under the Electronic Fund Transfers Act, 15 U.S.C. §§ 1693–1693r, and several state law claims including breach of contract, which is the only claim at issue on appeal.

Page advanced two theories to support her breach-of-contract claim. Under the account-balance theory, Page alleged that the Agreement unambiguously prohibits Alliant from charging NSF fees when an account has sufficient funds under the ledger-balance method. Her multiple-fees theory argued that the Agreement unambiguously prohibits Alliant from charging multiple NSF fees when a merchant repeatedly attempts to debit an account with insufficient funds. In the alternative, Page argued that the Agreement was ambiguous

and that discovery was necessary to determine the intent of the contracting parties.

The district court granted Alliant's motion to dismiss. *See* Fed. R. Civ. P. 12(b)(6). First, the court rejected Page's account-balance theory, explaining that "the plain, unambiguous language states that a member needs sufficient *available* funds" and reasoning that Page's proposed reading would render § 7(a)'s use of the word "available" meaningless. The court distinguished an Eleventh Circuit case holding a similar contract was ambiguous because the contract at issue in that case did not contain the word "available" in proximity to "sufficient funds."

Second, the court rejected the multiple-fees theory. Section 8(a) states that when a transaction without sufficient funds occurs, "your account may be subject to a charge," indicating a singular fee per transaction made by the customer. The court held, however, that this interpretation would be inconsistent with § 8(b), which provides: "If the amount of the item presented for payment exceeds the total of all available overdraft sources, the item will be returned as non-sufficient funds (NSF) and you will be charged applicable fees." The plural "fees," the court concluded, permitted Alliant to charge multiple fees when a merchant presented the same transaction to Alliant more than once.

The district court dismissed the case with prejudice. Page appealed.

## II. Discussion

### A. Jurisdiction

As a court of limited jurisdiction, we have an obligation to ensure that a case is properly in federal court before reaching

the merits. *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 529 (7th Cir. 2022). The Class Action Fairness Act of 2005 ("CAFA") provides federal district courts with original jurisdiction over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—(A) any member of a class of plaintiffs is a citizen of a State different from any defendant …." 28 U.S.C. § 1332(d)(2). Page, a New Jersey citizen, brought this putative class action against Alliant, an Illinois citizen, and she alleges that, in the aggregate, there is more than $5,000,000 in controversy. So CAFA's jurisdictional requirements appear to be satisfied.

But CAFA requires a district court to abstain from exercising jurisdiction over some actions that meet its requirements. At issue here is what we call the "home-state controversy" exception to CAFA jurisdiction. "A district court shall decline to exercise jurisdiction" if "(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." § 1332(d)(4). Because this action asserts claims under Illinois law and Illinois law primarily protects Illinois citizens, we were concerned by the possibility that § 1332(d)(4)(B) applied. Although a question of abstention differs from one of subject-matter jurisdiction, *see Myrick v. WellPoint, Inc.*, 764 F.3d 662, 665 (7th Cir. 2014), we may raise CAFA abstention on our own motion, *see Johnson v. Diakon Logistics, Inc.*, 44 F.4th 1048, 1051 (7th Cir. 2022). At oral argument, we requested supplemental briefing on this issue.

After that briefing, we are satisfied that abstention is not required. First, the Agreement's choice-of-law provision makes clear that Illinois law applies to all of Alliant's

customers, not just Illinois citizens. This fact mitigates our concern that at least two-thirds of class members might be Illinois citizens. Second, over 80% of Alliant customers with checking accounts reside outside of Illinois. To be sure, citizenship and residence are not equivalent, *Myrick*, 764 F.3d at 664, so some Illinois-resident customers may be citizens of other states and vice versa. But with such a large disparity between the proportion of Alliant customers who are Illinois residents and the proportion of Illinois citizens necessary to trigger CAFA abstention, the difference between residence and citizenship is not significant enough to require further proof of class members' citizenship at this stage. *Cf. id.* at 665 (indicating that CAFA abstention decisions can be made via sampling). Because § 1332(d)(4)(B) does not apply, jurisdiction under § 1332(d)(2) exists.[3] We therefore turn to the merits.

### B. Breach of Contract

We review de novo the grant of a motion to dismiss for failure to state a claim. *E. Coast Ent. of Durham, LLC v. Hous. Cas. Co.*, 31 F.4th 547, 550 (7th Cir. 2022). To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Paradigm Care & Enrichment Ctr., LLC v. W. Bend Mut. Ins. Co.*, 33 F.4th 417, 420 (7th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). We take Page's factual allegations as true and draw all

---

[3] The parties also argue that at the time Page filed this lawsuit, the district court had federal-question jurisdiction over the Electronic Fund Transfers Act claim and supplemental jurisdiction over the state law claims, *see* 28 U.S.C. §§ 1331, 1367(a), and that supplemental jurisdiction still exists on appeal. Because we have jurisdiction under § 1332(d)(2), we decline to consider this argument.

reasonable inferences in her favor. *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 584 (7th Cir. 2021).

"Contract construction is a legal issue which is reviewed de novo." *Hongbo Han v. United Cont'l Holdings, Inc.*, 762 F.3d 598, 600 (7th Cir. 2014). Illinois law governs the Agreement, so we look to Illinois law for principles of construction. "Courts applying Illinois law aim to 'ascertain the parties' intent' by first consulting 'the plain and ordinary meaning of the contract language.'" *E. Coast Ent.*, 31 F.4th at 550 (quoting *Am. Bankers Ins. Co. of Fla. v. Shockley*, 3 F.4th 322, 327 (7th Cir. 2021)). "Undefined terms will be given their plain, ordinary, and popular meaning; *i.e.*, they will be construed with reference to the average, ordinary, normal, reasonable person." *Sproull v. State Farm Fire & Cas. Co.*, 184 N.E.3d 203, 209 (Ill. 2021). Mere "disagreement between the parties as to meaning does not itself make the [contract] ambiguous, and the court 'will not strain to find an ambiguity where none exists.'" *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 308 (7th Cir. 2021) (quoting *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1004 (Ill. 2010)).

The district court held that the Agreement was unambiguous and that under its plain meaning, Alliant's conduct was not a breach of contract. We agree and affirm.

### 1. The Account-Balance Theory

In Page's view, the Agreement promises that Alliant will not charge NSF fees unless a customer's account has an insufficient ledger balance at the time of the transaction. She contends that the plain language of the contract makes this promise. Section 8(a) provides that when Alliant determines a customer has an "insufficient account balance" to cover a

transaction, "[her] account may be subject to a charge." Page argues that an ordinary English speaker would understand "account balance" to mean what the banking industry calls the ledger balance. But even if Page is correct, we must look beyond § 8(a) and construe the contract as a whole. *Sanders v. Ill. Union Ins. Co.*, 157 N.E.3d 463, 467–68 (Ill. 2019). Section 7(a) warns that Alliant "permit[s] withdrawals only if [an] account has *sufficient available funds* to cover the full amount of the withdrawal" and that "[c]hecks or other transfer or payment orders which are drawn against *insufficient funds* may be subject to a service charge as set forth in the Fee Schedule." (emphases added). A reasonable person would read § 7(a) before § 8(a) and understand that § 8(a)'s reference to an "insufficient account balance" refers back to § 7(a)'s "insufficient available funds."

Page counters that because § 7(a) and § 8(a) use different words, an "insufficient account balance" under § 8(a) must mean something different than lacking "sufficient available funds." She asserts that "*every* provision in the agreement concerning fees expressly applies to 'insufficient funds' or the equivalent. In contrast, not one of these provisions mentions 'sufficient *available* funds,' or explains that funds might not be available …." Page proposes this interpretation to reconcile the Agreement's use of different phrases: the available balance is relevant only for purposes of withdrawal restrictions, while the ledger balance is used for purposes of assessing fees.

There are several problems with this argument. First, Page incorrectly states that "none of these provisions say … that Alliant is entitled to a fee when it restricts withdrawals." Section 7(a) says just that: "Checks or other transfer or payment

orders which are drawn against insufficient funds may be subject to a service charge as set forth in the Fee Schedule." Second, and relatedly, while § 7(a) is titled "Withdrawal Restrictions," it applies to more transactions than what might be considered a classic withdrawal, such as cash from an ATM. It covers "[c]hecks or other transfer or payment orders," a phrase that encompasses virtually every debit against the account. Thus, § 7(a) informs the customer that whenever someone attempts a debit but the account lacks "sufficient available funds," Alliant may charge a fee. Third, a contract is construed based on how a reasonable person would understand it. *Sproull*, 184 N.E.3d at 209. It is implausible that a reasonable person would think that, without expressly saying so, the Agreement used two different methods of calculating the account balance in consecutive sections. *Cf. Lease Mgmt. Equip. Corp. v. DFO P'ship*, 910 N.E.2d 709, 716–17 (Ill. Ct. App. 2009) (holding that references to "return possession" and "redelivery" were synonymous, despite using different words).

Next, Page argues that evidence of a banking-industry custom to clearly disclose when NSF fees are assessed based on the available-balance method should inform interpretation of the Agreement. According to Page, other institutions clearly disclose—sometimes in large, bold print—when they use the available-balance method. Alliant's failure to use similar language, Page argues, means that the Agreement must not have been intended to allow Alliant to use the available-balance method when assessing fees. The district court did not consider this evidence because it held that the Agreement was unambiguous, which Page argues was an error under Illinois law. Even if such evidence had been considered, it would not have helped Page. Some of the proposed evidence, such as changes Alliant made to its contracts, dates from after

the parties entered into the Agreement. This evidence is irrelevant because "[p]roof of custom or usage is intended as an aid to the interpretation of the intent of the parties at the time the contract was made." *Chi. Bridge & Iron Co. v. Reliance Ins. Co.*, 264 N.E.2d 134, 139 (Ill. 1970). But even evidence that predates the Agreement would not change the outcome. The fact that some institutions disclosed that they used the available-balance method differently or more clearly does not prove that the Agreement promised to use the ledger-balance method or that the Agreement is ambiguous. The lack of conspicuous disclaimers about how Alliant assesses NSF fees does not change the fact that the available-balance method better fits the contractual language than the ledger-balance method.

Finally, Page argues that the terms of the Agreement are at a minimum ambiguous and asks us to let the litigation continue beyond the motion-to-dismiss stage. She compares the Agreement's language to contractual terms analyzed in *Tims v. LGE Community Credit Union*, 935 F.3d 1228 (11th Cir. 2019). In *Tims*, the contract stated:

> "if an item is presented without sufficient funds in your account to pay it" or "if funds are not available to pay all of the items" presented for payment, [the credit union] "may, at its discretion, pay" the item or items, creating an overdraft for which [the credit union] will charge a fee.

*Id*. at 1236 (internal alterations omitted). The court reversed the grant of the defendant's motion to dismiss "[b]ecause the language remains ambiguous after considering both the plain language of the contracts and the Georgia canons of construction before us …." *Id*. at 1242.

The district court here distinguished *Tims*, which involved "an agreement in which the term 'available' was untethered to the financial institution's fee policy for overdrafts." Page argues that "the court failed to recognize that 'available' is equally untethered from overdrafts here" and that "the argument that *Tims* rejected—that the 'proximity of the word "available"' to the fee provision was enough to indicate the available-balance method—is precisely the argument that the district court accepted here." But *Tims* only considered—and rejected—the proximity argument after determining that the contract was ambiguous, and the contract in *Tims* was materially different than Alliant's Agreement. *See Tims*, 935 F.3d at 1239–41. Section 7(a) of the Agreement links "sufficient available funds" with NSF fees in the span of two consecutive sentences, tethering "available" to overdraft provisions much more closely than in the *Tims* contract. The district court rightly recognized these differences and reached a different conclusion than *Tims*.

Analyzing this contract under Illinois principles of construction, we agree with the district court that the Agreement is not ambiguous and that it does not prohibit Alliant from using the available-balance method to charge NSF fees. The district court correctly rejected the account-balance theory.

### 2. The Multiple-Fees Theory

Page's second theory is that the Agreement promises to assess an NSF fee only one time per transaction by the customer. She argues that if Alliant rejects a transaction and charges an NSF fee, Alliant may not charge additional fees if the payee presents the same transaction to Alliant again. The Fee Schedule provides for a $25 "Nonsufficient Fund Item (*each*)," so this theory turns on the definition of "item."

Page reads § 7(a) and the Fee Schedule to mean that "Alliant may charge 'a' $25 [NSF] 'charge' for 'each' payment order that a member draws against insufficient funds." The district court rejected this argument based in part on § 8(b), "Overdraft Protection Plan," which states: "If the amount of the item presented for payment exceeds the total of all available overdraft sources, the item will be returned as non-sufficient funds (NSF) and you will be charged applicable *fees*." (emphasis added). Page argues that the district court was wrong to consider § 8(b) because Page was not enrolled in a protection plan. We agree. A reasonable person reading the Agreement would not think that a provision describing an optional plan would bear on the contract's interpretation if she opted out of that plan. Even if the person read past § 8(b)'s title, its first sentence would indicate that it applies only "[i]f you have applied for and we have approved the Overdraft Protection plan for your account …." The district court should not have considered § 8(b) when analyzing Page's multiple-fees theory.

Even without considering § 8(b), though, we agree with the district court that the Agreement does not forbid Alliant from charging multiple fees when it is presented with the same transaction more than once. Page argues that "item" means a "payment order that a *member* draws against insufficient funds." Under this interpretation, because she, the member, made just one payment, Alliant can charge only one fee. But this reading does not hold up under scrutiny. Section 8(a) states: "We do not have to notify you if your account does not have funds to cover checks, ACH debits, debit card transactions, fees or other posted items. Whether the item is paid or returned, your account may be subject to a charge as set forth in the Fee Schedule." The list ending with "other posted

items" means that the previous terms are also "items," including ACH debits. *See Corbett v. County of Lake*, 104 N.E.3d 389, 397 (Ill. 2017) ("[W]ords grouped in a list should be given related meaning." (quoting *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977))).[4] An ACH debit—or an automated clearinghouse debit—occurs when a payee debits a person's account. Defining "item" by reference to the debit rather than the transaction or purchase renders Page's reading untenable. Taken together, § 8(a) and the Fee Schedule permit Alliant to charge an NSF fee each time a payee attempts to make an ACH debit from an account with insufficient funds.

The Agreement does not prohibit Alliant from charging multiple NSF fees for a transaction that is presented and rejected several times. The district court correctly rejected the multiple-fees theory.

### III. Conclusion

Alliant could have drafted the Agreement more clearly than it did, but that is not the question before this court. Our inquiry is whether Alliant promised not to use the available-balance method to assess NSF fees or not to charge multiple fees when a transaction is presented to it multiple times. Alliant made no such promises, and the district court properly dismissed Page's breach-of-contract claim.

AFFIRMED

---

[4] *Corbett* interpreted a statute, not a contract, but Illinois courts interpret contracts by applying "general rules of construction." *See U.S. Tr. Co. of N.Y. v. Jones*, 111 N.E.2d 144, 147 (Ill. 1953).